Document 1

Document 2

Document 3

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

NOTICE OF JUDGMENT
August 22, 2007

TO: Hollis Raphael Weisman, Esq.
Peter Raymond Johnson, Esq.
Lisa Woodward Lunt, Esq.
Lauren Elizabeth Case, Esq.

Judgment was entered this date in Case Number(s): 05-4883

The Court's decision is enclosed.

PETITION FOR REHEARING (FRAP 40)
PETITION FOR REHEARING EN BANC (FRAP 35)

**Filing Time** A petition must be received in the clerk's office within 14 days after judgment to be timely. There are three exceptions to this rule:

(1) In all civil cases in which the United States or an agency or officer thereof is a party, any petition for rehearing must be received in the clerk's office within 45 days after entry of judgment.

(2) The Court may grant an extension of time or leave to file a petition for rehearing out of time if the party establishes that the delay resulted from the death or serious illness of counsel or a family member (or of a party or family member in pro se cases) or other circumstances wholly beyond the control of counsel or a party proceeding without counsel.

(3) Prisoner petitions are deemed filed when delivered to prison authorities.

If a petition for rehearing en banc is to be filed, it must be filed at the same time and in the same document as the petition for rehearing and must be clearly identified in the title.

Each case number to which the petition applies must be listed on the petition, even in companion or consolidated cases. Failure to list the individual case numbers on the petition will result in the unidentified cases proceeding to mandate even if a timely petition for rehearing has been filed in a companion or consolidated case.

A timely filed petition for rehearing or petition for rehearing en banc will stay the mandate and toll the running of time for filing a petition for writ of certiorari.

**Purpose** A petition should only be made to direct the Court's attention to one or more of the following situations:

1. A material fact or law overlooked in the decision.
2. A change in the law which occurred after the case was submitted and which was overlooked by the panel.
3. The opinion is in conflict with a decision of the United States Supreme Court, this Court, or another court of appeals, and the

conflict is not addressed in the opinion.
4. The proceeding involves one or more questions of exceptional importance.

Statement of Counsel — A petition shall contain an introduction stating that, in counsel's judgment, one or more of the situations exist as described in the above "Purpose" section. The points to be raised shall be succinctly listed in the statement.

Form — The 15 page limit allowed by the Rule shall be observed. The Court requires 4 copies of the petition (20 copies of a petition for rehearing en banc), and a copy of the Court's opinion must be attached to each copy of the petition.

BILL OF COSTS (FRAP 39)

Filing Time — A party to whom costs are allowed, who desires taxation of costs, shall file a bill of costs on or before 09/05/07.

MANDATE (FRAP 41)

Issuance Time — In original proceedings before this Court, there is no mandate. Unless the Court shortens or extends the time, in all other cases, the mandate issues 7 calendar days after the expiration of the time for filing a petition for rehearing. A timely petition for rehearing, petition for rehearing en banc, or motion to stay the mandate will stay the issuance. If the petition or motion is denied, the mandate will issue 7 calendar days later. If a stay of mandate is sought, only the original of a motion need be filed.

Stay — A motion for stay of the issuance of the mandate shall not be granted simply upon request. Ordinarily the motion will be denied unless it would not be frivolous or filed merely for delay and would present a substantial question or otherwise set forth good or probable cause for a stay.

CRIMINAL CASES (Plan in Implementation of the CJA)

Criminal — In criminal cases, counsel must inform the defendant in writing of the right to file a petition for writ of certiorari from an adverse decision of this Court. Counsel appointed under the Criminal Justice Act must file their vouchers within 60 days of entry of judgment, denial of a petition for rehearing, or the grant or denial of a petition for writ of certiorari, whichever is later.

PETITION FOR WRIT OF CERTIORARI (Sup.Ct.R. 13)

Filing Time — Review on writ of certiorari is not a matter of right, but of judicial discretion, and will be granted only for compelling reasons. The petition must be filed in the United States Supreme Court within 90 days of this Court's entry of judgment. The time does not run from the issuance of the mandate. If a petition for rehearing is timely filed, the time runs from the denial of that petition. Content, fees, and number of copies of a petition for writ of certiorari are governed by the Rules of the United States Supreme Court.

JUDGMENT

FILED: August 22, 2007

UNITED STATES COURT OF APPEALS

for the

Fourth Circuit

No. 05-4883
CR-05-63

UNITED STATES OF AMERICA

Plaintiff - Appellee

v.

DWONNE A. WASHINGTON

Defendant - Appellant

---

Appeal from the United States District Court for the
District of Maryland at Greenbelt

---

In accordance with the written opinion of this Court filed this day, the Court affirms the judgment of the District Court.

A certified copy of this judgment will be provided to the District Court upon issuance of the mandate. The judgment will take effect upon issuance of the mandate.

/s/ Patricia S. Connor

CLERK

**PUBLISHED**

# UNITED STATES COURT OF APPEALS

## FOR THE FOURTH CIRCUIT

| | |
|---|---|
| UNITED STATES OF AMERICA, *Plaintiff-Appellee,*<br>v.<br>DWONNE A. WASHINGTON, *Defendant-Appellant.* | No. 05-4883 |

Appeal from the United States District Court
for the District of Maryland, at Greenbelt.
Alexander Williams, Jr., District Judge.
(CR-05-63)

Argued: March 13, 2007

Decided: August 22, 2007

Before NIEMEYER, MICHAEL, and TRAXLER, Circuit Judges.

---

Affirmed by published opinion. Judge Niemeyer wrote the opinion, in which Judge Traxler joined. Judge Michael wrote a dissenting opinion.

---

## COUNSEL

**ARGUED:** Lauren Elizabeth Case, Staff Attorney, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Greenbelt, Maryland, for Appellant. Hollis Raphael Weisman, Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Greenbelt, Maryland, for Appellee. **ON BRIEF:** James Wyda, Federal Public Defender, Lisa W. Lunt, Assistant Federal Public Defender, OFFICE

OF THE FEDERAL PUBLIC DEFENDER, Greenbelt, Maryland, for Appellant. Rod J. Rosenstein, United States Attorney, Baltimore, Maryland, for Appellee.

---

**OPINION**

NIEMEYER, Circuit Judge:

Dwonne Washington was convicted of driving on the Baltimore-Washington Parkway, in the territorial jurisdiction of the United States in Prince George's County, Maryland, while under the influence of alcohol or drugs, in violation of 36 C.F.R. § 4.23(a)(1), and of unsafe operation of a vehicle, in violation of 36 C.F.R. § 4.22.

At trial, the government offered, over Washington's objection, the expert testimony of Dr. Barry Levine, the Director of the Forensic Toxicology Laboratory of the Armed Forces Institute of Pathology, to prove that a blood sample, taken from Washington the night of his arrest and tested at Dr. Levine's lab, contained phencyclidine ("PCP") and alcohol and that Washington's conduct and unsafe driving during the night of his arrest were attributable to the presence of PCP and alcohol in Washington's blood. In Washington's view, the raw data generated by the forensic lab's diagnostic machines and relied on by Dr. Levine to give his testimony amounted to testimonial hearsay statements of the lab technicians who operated the machines. As a result, Washington claims that Dr. Levine's testimony was not admissible, as Washington had a right to confront the technicians and cross-examine them by reason of the Sixth Amendment's Confrontation Clause. *See Davis v. Washington*, 126 S. Ct. 2266 (2006); *Crawford v. Washington*, 541 U.S. 36 (2004).

The magistrate judge overruled Washington's objection, admitted Dr. Levine's testimony, and found Washington guilty of the charges.

On appeal, Washington continues to maintain that the machine-generated data amounted to testimonial hearsay statements of the machine operators, and that at trial, Dr. Levine merely restated the hearsay statements of the operators, in violation of the Confrontation Clause and the hearsay rule. *See* Fed. R. Evid. 802.

Without deciding whether Dr. Levine's testimony actually introduced into evidence the raw data on which he relied to give his testimony, we nonetheless conclude that the data on which Dr. Levine relied (1) did not constitute the statements of the lab technicians; (2) were not hearsay statements; and (3) were not testimonial. Accordingly, we conclude that the magistrate judge did not abuse his discretion in admitting the testimony of Dr. Levine and affirm.

I

At 3:30 a.m. on January 3, 2004, Officer Gary Hatch of the United States Park Police was patrolling the Baltimore-Washington Parkway when he saw a car going approximately 30 miles per hour in an area posted with a speed limit of 55 miles per hour. Officer Hatch stated that it was "as though [the car] was almost standing still." Officer Hatch turned on his siren and flashing lights to pull the car over to find out "why they were going so slow," but the car did not stop. Accelerating and decelerating, pulling off onto the shoulder, and then back onto the road, the car continued to meander along the parkway as Officer Hatch pursued it with his siren and flashing lights. Only with the assistance of another park police officer, who maneuvered in front of the car, was Officer Hatch able to force the car to stop.

Officer Hatch approached the car and saw Dwonne Washington in the driver's seat staring disaffectedly straight ahead. Washington did not respond to Officer Hatch's directives to show his hands or to open the car door. According to Officer Hatch's experience, when someone is completely unresponsive to commands or his surroundings, he is usually under the "influence of some type of narcotic or strong influence of alcohol." When Officer Hatch opened the door, he caught a "very strong smell of PCP."

Officer Hatch removed Washington from the car, placed him in handcuffs, and again asked him "basic questions to see if he would start responding to anything." Washington did not respond to any of Officer Hatch's questions, "including simply what his name was," although Washington did say that he had "smoked a little something earlier." Based on the strong PCP odor and Washington's flat, unresponsive demeanor, Officer Hatch took Washington to a hospital where Washington agreed to give a blood sample for testing. The

blood sample was sent for analysis to the Armed Forces Institute of Pathology, a branch of the Department of Defense, which performs alcohol and drug testing for Walter Reed Hospital as well as for military and civilian court cases. Officer Hatch requested that the sample be tested for "ethanol" and for "other drugs."

The Institute's Forensic Toxicology Laboratory subjected the blood sample to "headspace gas chromatography" to identify whether ethanol was in the blood and to "immunoassay or chromatography" to screen for the presence of amphetamine, barbiturates, benzodiazepines, cannabinoids, cocaine, opiates, and phencyclidine, using a Hewlett Packard HP 6890 Series gas chromatograph machine and computers with HP ChemStation software. After lab technicians subjected the blood sample to testing, the instruments printed out some 20 pages of data and graphs. Based on the data, the director of the lab and its chief toxicologist, Dr. Barry Levine, issued a report to the United States Park Police, stating that the blood sample "contained 27 mg/dL of ethanol" and that the sample tested positive for phencyclidine, containing "0.04 mg/L of phencyclidine as quantitated by gas chromatograph/spectrometry." While Dr. Levine did not see the blood sample and did not conduct any of the tests himself, three lab technicians operating under his protocols and supervision conducted the tests and then presented the raw data from the tests to him.

The raw data were mechanical computer printouts with each page headed by the date of the test, the machine operator, an identification of the sample, its dilution factor, and other similar information, and containing computer-generated graphs and data reporting the results produced by the chromatograph machine.

Based on Dr. Levine's report, the government charged Washington by citation with driving under the influence of alcohol or drugs, unsafe operation of a vehicle, and other Class B misdemeanors relating to his driving and arrest.

At trial, the court accepted Dr. Levine as an expert witness and admitted his testimony under Rules 702 and 703 of the Federal Rules of Evidence, concluding that Dr. Levine was (1) "somebody who is qualified to give his opinion as to the results of the tests performed on blood samples in this particular case," and (2) "as an expert toxi-

cologist as to the toxic effects of PCP and alcohol on human behavior." In his testimony, Dr. Levine summarized his report, stating that the tests showed that Washington's blood ethanol concentration was 27 milligrams per deciliter and his phencyclidine concentration was .04 milligrams per liter. Dr. Levine also gave his expert opinion that the presence of PCP and alcohol in Washington's blood was consistent with "the behavior of somebody who was non-responsive to a police officer on the side of a road," as Officer Hatch had reported in this case about Washington.

Washington objected to Dr. Levine's testimony insofar as he stated that Washington's blood sample contained PCP and alcohol, arguing that Dr. Levine never personally saw his blood sample nor personally performed the testing. Washington argued that Dr. Levine's reliance upon the raw data obtained by his lab technicians from the diagnostic machines violated his rights under the Confrontation Clause of the Sixth Amendment. In Washington's view, he was entitled to confront the lab technicians who actually saw his blood and placed it in the testing machines.

The magistrate judge overruled Washington's objections and admitted Dr. Levine's testimony. At the conclusion of the two-day trial, the magistrate judge found Washington guilty of the crimes charged and sentenced him to 60 days' imprisonment. The district court affirmed, and this appeal followed, raising solely the question of the admissibility of Dr. Levine's testimony.

## II

Washington begins his argument with the observation that "Dr. Levine did not participate in any of the testing on the blood sample in this case." Rather, he notes, Dr. Levine relied upon data generated by the lab's diagnostic machines, operated by various lab technicians. He then argues that these "reports" of raw data were hearsay "testimonial statements," as articulated in *Crawford v. Washington*, 541 U.S. 36 (2004), of the various lab technicians. Because the technician-witnesses were not unavailable, Washington concludes that it was a violation of his rights under the Confrontation Clause not to have the technicians in the courtroom and instead to admit their hearsay state-

ments — i.e., the machine-generated reports of raw data — through Dr. Levine's testimony.

The Confrontation Clause provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. Const. amend. VI. In *Crawford*, the Supreme Court held that the Confrontation Clause bars the "admission of *testimonial statements* of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had had a prior opportunity for cross-examination." 541 U.S. at 53-54 (emphasis added). Only "testimonial statements" "cause the declarant to be a 'witness' within the meaning of the Confrontation Clause. It is the testimonial character of the statement that separates it from other hearsay that, while subject to traditional limitations upon hearsay evidence, is not subject to the Confrontation Clause." *Davis v. Washington*, 126 S. Ct. 2266, 2273 (2006) (citation omitted).

In the case before us, the "statements" in question are alleged to be the assertions that Washington's blood sample contained PCP and alcohol. But those statements were never made by the technicians who tested the blood. The most the technicians could have said was that the *printed data* from their chromatograph machines showed that the blood contained PCP and alcohol. The machine printout is the only source of the statement, and no *person* viewed a blood sample and concluded that it contained PCP and alcohol. Yet, the very same data that would have permitted the lab technicians to say that the blood contained PCP and alcohol were also seen and interpreted by Dr. Levine. Moreover, those data were the only basis upon which Dr. Levine stated in court that the blood sample contained PCP and alcohol. In short, the inculpating "statement" — that Washington's blood sample contained PCP and alcohol — was made by the machine on printed sheets, which were given to Dr. Levine. The technicians could neither have affirmed or denied *independently* that the blood contained PCP and alcohol because all the technicians could do was to refer to the raw data printed out by the machine. Thus, the statements to which Dr. Levine testified in court — the blood sample contained PCP and alcohol — did not come from the out-of-court technicians, and so there was no violation of the Confrontation Clause.

Moreover, there would be no value in cross-examining the lab technicians on their out-of-court statements about whether the blood

sample tested positive for PCP and alcohol because they made no such statements. They would only be able to refer to the machine's printouts, which Dr. Levine also had. The value of cross-examination might relate to authentication or to a description of the machines or to the chain of custody, but none of these were issues at trial, nor are they issues on appeal. Whether the machines properly reported PCP or alcohol is determined by the raw data that the machines generated, and its truth is dependent solely on the machine.

Thus, we reject the characterization of the raw data generated by the lab's machines as statements *of the lab technicians* who operated the machines. The raw data generated by the diagnostic machines are the "statements" *of the machines* themselves, not their operators. But "statements" made by machines are not out-of-court statements made by declarants that are subject to the Confrontation Clause.

A "statement" is defined by Federal Rule of Evidence 801(a) as an "(1) oral or written assertion or (2) nonverbal conduct of a *person*, if it is intended by the person as an assertion."[1] (Emphasis added). Obviously, the lab technicians made no statements of any kind, and they did not say or write the information generated by the machines. The machines generated data by manipulating blood through a common scientific and technological process. The lab technicians' role was simply to operate the machines. The "statement" that Washington's blood contained PCP and alcohol is a conclusion drawn only from the machines' data, and its source was independent of human observation or reporting. Only the machine, through its diagnostic and technical process, could provide facts about the chemical composition of Washington's blood. Accordingly, the raw data generated by the machines were not the statements of technicians.[2]

---

[1]While the hearsay rules of the Federal Rules of Evidence do not formally demarcate the scope of "statements" for Confrontation Clause purposes, we take this definition to be uncontroversial, especially since the Sixth Amendment provides the right to confront (human) "witnesses."

[2]Contrary to the dissent's assertion, which makes no distinction between a chromatograph machine and a typewriter or telephone, the chromatograph machine's output is a mechanical response to the item analyzed and in no way is a communication of the operator. While a

Additionally, this raw data generated by the machines were not hearsay statements as implicated by the Confrontation Clause. Hearsay is understood to be "a *statement*, other than one made by the *declarant* while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Fed. R. Evid. 801(c) (emphasis added). "A declarant is a *person* who makes a statement." Fed. R. Evid. 801(b) (emphasis added). And a "statement," to repeat, is an "(1) oral or written assertion or (2) nonverbal conduct of a *person*, if it is intended by the person as an assertion." Fed. R. Evid. 801(a) (emphasis added). Only a *person* may be a declarant and make a statement. Accordingly, "nothing 'said' by a machine . . . is hearsay." 4 Mueller & Kirkpatrick, *Federal Evidence*, § 380, at 65 (2d ed. 1994). *See United States v. Hamilton*, 413 F.3d 1138, 1142-43 (10th Cir. 2005) (concluding that the computer-generated header information accompanying pornographic images retrieved from the Internet was not a hearsay statement because there was no "person" acting as a declarant); *United States v. Khorozian*, 333 F.3d 498, 506 (3d Cir. 2003) (concluding that an automatically generated time stamp on a fax was not a hearsay statement because it was not uttered by a person); *People v. Holowko*, 486 N.E.2d 877, 878-79 (Ill. 1985) (concluding "that the printout of results of computerized telephone tracing equipment is not hearsay evidence" but rather "a self-generated record of its operations") (citations omitted).

In short, the raw data generated by the machines do not constitute "statements," and the machines are not "declarants." As such, no out-of-court statement implicating the Confrontation Clause was admitted into evidence through the testimony of Dr. Levine.

Any concerns about the reliability of such machine-generated information is addressed through the process of authentication not by hearsay or Confrontation Clause analysis. When information provided by machines is mainly a product of "mechanical measurement or manipulation of data by well-accepted scientific or mathematical

typewriter or telephone transmits the communicative assertion of the operator, the chromatograph machine transmits data it derives from the sample being analyzed, independent of what the operator would say about the sample, if he or she had anything to say about it.

USCA4 Appeal: 05-4883 Doc: 56 Filed: 08/22/2007 Pg: 13 of 19



techniques," 4 Mueller & Kirkpatrick, *supra* § 380, at 65, reliability concerns are addressed by requiring the proponent to show that the machine and its functions are reliable, that it was correctly adjusted or calibrated, and that the data (in this case, the blood) put into the machine was accurate (i.e., that the blood put into the machine was the defendant's). In other words, a foundation must be established for the information through authentication, which Federal Rule of Evidence 901(b)(9) allows such proof to be authenticated by evidence "describing [the] process or system used to produce [the] result" and showing it "produces an accurate result." But none of these concerns were issues below, nor are they issues in this appeal.[3]

Finally, the supposed "hearsay statements" made by the machines were not "testimonial" in that they did not involve the relation of a past fact of history as would be done by a witness. *See Davis*, 126 S. Ct. at 2276-77. In *Davis*, the Court concluded that the transcript of a 911 call, in which the caller identified the defendant as one who was assaulting her, did not contain "testimonial statements," requiring the prosecution to present the declarant in court. "Rather than describing past events," the statements by the 911 caller were "speaking about events as they were actually happening," made for purposes of addressing an ongoing emergency. 126 S. Ct. at 2276. At bottom, the Court observed that the 911 call took place "to meet an ongoing emergency" and that the caller was not testifying as a "witness," in a form that would be a "weaker substitute for live testimony" about events witnessed. *Id.* at 2277. Similarly, the reports generated by the machines were not testimonial in that they were not relating past events but the current condition of the blood in the machines. To the extent that they contain assertions of fact, they say simply that "this

---

[3]The dissenting opinion universally mixes authentication issues with its argument about "statements" from the machine that the blood contains PCP and alcohol. Obviously, if the defendant wished to question the manner in which the technicians set up the machines, he would be entitled to subpoena into court and cross-examine the technicians. But once the machine was properly calibrated and the blood properly inserted, it was the machine, not the technicians, which concluded that the blood contained PCP and alcohol. The technicians never make that determination and accordingly could not be cross-examined on the veracity of that "statement."

blood sample that has been put into the machine tests positive for PCP and alcohol." The machine's "statement" relates solely to the *present condition* of the blood, without making any links to the past. While Dr. Levine did provide "testimony" connecting the blood sample with Washington's past behavior, this testimony was presented in court in conformity with the Confrontation Clause, was properly authenticated, and is not challenged on appeal.

As the machine's output did not "establish or prove past events" and did not look forward to "later criminal prosecution" — the machine could tell no difference between blood analyzed for health-care purposes and blood analyzed for law enforcement purposes — the output could not be "testimonial." *Davis*, 126 S. Ct. at 2273-74.

Because raw data printed out by the machines are not testimonial hearsay statements, Dr. Levine's testimony using those data did not violate the Confrontation Clause, nor the hearsay rule, and the magistrate judge did not err in admitting the testimony of Dr. Levine.

Accordingly, the judgment of the district court is

*AFFIRMED*.

MICHAEL, Circuit Judge, dissenting:

The Sixth Amendment's Confrontation Clause bars "admission of testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had a prior opportunity for cross-examination." *Crawford v. Washington*, 541 U.S. 36, 53-54 (2004). In this case testimonial statements (laboratory test results) of witnesses (laboratory technicians) who did not appear at trial were introduced against Dwonne Washington. Accordingly, I respectfully dissent from the majority's holding that the admission of the test results did not violate Washington's Confrontation Clause right. Unlike the majority, I conclude that (1) the test results are the hearsay statements of the laboratory technicians; (2) the statements are testimonial; and (3) the defendant, and not this court, must determine whether there would be value in cross-examining the technicians.

The laboratory test results in this case, which were offered to prove that Washington's blood contained intoxicating levels of phencyclidine (PCP) and alcohol, were the hearsay statements of the technicians who ran the tests. The test results, although computer-generated, were produced with the assistance and input of the technicians and must therefore be attributed to the technicians. For this reason, the majority is mistaken in concluding that "[t]he raw data generated by the diagnostic machines [or computers] are the 'statements' of the machines themselves." *See ante* at 7.

Courts consistently consider computer-generated assertions of fact as hearsay statements that are admissible only under one of the exceptions to the hearsay rule. *See United States v. Blackburn*, 992 F.2d 666 (7th Cir. 1993) (computer printouts of lensometer readings); *United States v. Enterline*, 894 F.2d 287 (8th Cir. 1990) (computer report identifying vehicle as stolen); *United States v. Baker*, 855 F.2d 1353 (8th Cir. 1988) (laboratory analyses of controlled substances); *United States v. DeWater*, 846 F.2d 528 (9th Cir. 1988) (breathalyzer test result); *United States v. Hardin*, 710 F.2d 1231 (7th Cir. 1983) (computer-generated graph of data collected by law enforcement); *United States v. McKinney*, 631 F.2d 569 (8th Cir. 1980) (blood test results); *State v. Madorie*, 156 S.W.3d 351 (Mo. 2005) (breathalyzer test result); *City of Helena v. Hoy*, 809 P.2d 1255 (Mont. 1991) (same). As these cases show, the majority is wrong in its claim that computer printouts or mechanical transmissions that do not directly transcribe the written or spoken words of humans are exempt from the hearsay rule.

In only one circumstance is a computer-generated assertion not considered the statement of a person: when the assertion is produced without any human assistance or input. In *United States v. Hamilton*, 413 F.3d 1138 (10th Cir. 2005), one of two federal cases relied on by the majority, the Tenth Circuit concluded that the computer-generated header information that accompanied a pornographic image on the internet was not a hearsay statement. "Of primary importance to this ruling," however, "[wa]s the uncontroverted fact that the header information was automatically generated by the computer . . . *without the assistance or input of a person*." *Id.* at 1142 (emphasis added). Similarly, in *United States v. Khorozian*, 333 F.3d 498 (3d Cir. 2003), the other federal case cited by the majority, the Third Circuit determined

that the transmission information on a faxed document was not a hearsay statement because it was automatically generated by the fax machine. *But see United States v. Salgado*, 250 F.3d 438 (6th Cir. 2001) (stating that telephone numbers recorded and stored by computer were hearsay statements that were admissible under the business records exception); *United States v. Linn*, 880 F.2d 209 (9th Cir. 1989) (same).

Unlike the header information on a web page or fax, computerized laboratory equipment cannot detect, measure, and record toxin levels in blood samples without the assistance or input of a trained laboratory technician. The toxicology tests on Washington's blood in this case were conducted by technicians at the Armed Forces Institute of Pathology. These technicians undergo extensive training before they are certified to perform the tests. A technician conducting a blood toxicology test must follow a "step-by-step procedure." J.A. 48. He must, among other things, calibrate the testing instrument; withdraw the appropriate portion of blood from the larger sample; insert, without contamination, the smaller test sample into the instrument; initiate the test; and monitor the instrument while the test is in progress. Finally, as the record in this case reveals, the technician reviews and annotates the results and signs the report. In light of the significant role that the technician plays in conducting the test and generating accurate results, the results cannot be attributed solely to the machine. As a result, the toxicology test results must be considered statements of the laboratory technicians for both evidentiary and Confrontation Clause purposes.[1]

The test results are *testimonial* statements, notwithstanding the majority's argument to the contrary. The Supreme Court in *Crawford*, rather than specifically defining "testimonial," provided examples that constitute the "core class of 'testimonial' statements." 541 U.S. at 51. Among these are "pretrial statements that declarants would reasonably expect to be used prosecutorially." *Id.* The Court further clarified the meaning of "testimonial" in *Davis v. Washington*, 126 S. Ct. 2266 (2006), stating that courts should also consider the "primary purpose"

[1]The government does not contend that the test results are not statements. At trial it conceded that the results are hearsay statements, but argued that they are admissible under the business records exception. *See* Fed. R. Evid. 803(6).

of the statement. A statement is not testimonial, for example, if its "primary purpose . . . is to enable police assistance to meet an ongoing emergency." *Id.* at 2273. A statement is testimonial, on the other hand, "when the circumstances objectively indicate . . . that the primary purpose of the [statement] is to establish or prove past events potentially relevant to later criminal prosecution." *Id.* at 2273-74.

The laboratory test results in this case are testimonial as contemplated by *Crawford* and *Davis*. First, the laboratory technicians who conducted the blood tests should have expected that the results would be used for criminal prosecution. The sample of Washington's blood that was sent to the testing laboratory was accompanied by a "Police Officer's Report" that identified Washington by name, offense (DUI), and date of arrest. *See United States v. Magyari*, 63 M.J. 123, 127 (C.A.A.F. 2006) (stating that "lab results . . . may become testimonial where a defendant is already under investigation, and where the testing is initiated by the prosecution to discover incriminating evidence"). Second, the primary purpose of the blood tests was to prove an essential element of the offense for which Washington was charged, specifically the presence of PCP and alcohol in his blood. For these reasons, the test results are testimonial. *See State v. March*, 216 S.W.3d 663, 666 (Mo. 2007) (lab report identifying crack cocaine is testimonial); *City of Las Vegas v. Walsh*, 91 P.3d 591, 595 (Nev. 2004) (affidavit of nurse who drew defendant's blood is testimonial); *State v. Moss*, 160 P.3d 1143, 1149 (Ariz. Ct. App. 2007) ("We conclude that the proposed testimony of [former laboratory director] reporting [defendant's] blood test results would constitute testimonial evidence within the meaning of *Crawford*."); *People v. Rogers*, 8 A.D.3d 888, 891-92 (N.Y. App. Div. 2004) (admission of blood alcohol test violated Confrontation Clause); *Johnson v. State*, 929 So. 2d 4, 7 (Fla. Dist. Ct. App. 2005) ("lab report prepared pursuant to police investigation and admitted to establish an element of a crime is testimonial hearsay"); *State v. Crager*, 844 N.E.2d 390, 397 (Oh. Ct. App. 2005) (lab reports and DNA reports are testimonial if they "are prepared solely for prosecution"); *State v. Miller*, 144 P.3d 1052, 1060 (Or. Ct. App. 2006) (lab report concluding urine contained methamphetamine is testimonial); *cf. United States v. Oates*, 560 F.2d 45, 80-81 (2d Cir. 1977) (concluding, pre-*Crawford*, that admitting chemist

report against the defendant could violate his Confrontation Clause right).[2]

The majority's conclusion that the blood test results are not testimonial because they "relate[ ] solely to the present condition of the blood," *ante* at 10, is not defensible. Again, according to *Davis*, the question is whether the primary purpose of the statement is to prove a past event relevant to prosecution. 126 S. Ct. at 2273-74. Here, U.S. Park Police Officer Gary Hatch took Washington to a hospital after his arrest, where a blood sample was taken. The sample was taken in an effort to prove that Washington's blood contained PCP and alcohol at the time he was pulled over on the Baltimore-Washington Parkway. The government could only prove that Washington had intoxicants in his blood at the time of the stop by showing their continued presence shortly thereafter. Thus, although the test results show the levels of PCP and drugs in Washington's blood at the time the sample was taken, the purpose of the test was to prove a past event relevant to prosecution.

Finally, it is not for the majority to say that "there would be no value in cross-examining the lab technicians." *Ante* at 6. A defendant's right to confront witnesses against him does not depend on whether a court believes that cross-examination would be useful. *Cf. Crawford*, 541 U.S. at 62 ("Dispensing with confrontation because testimony is obviously reliable is akin to dispensing with jury trial because a defendant is obviously guilty."). The strategic decision of

[2]I recognize that laboratory test results are not always testimonial. Many tests are conducted for purposes other than gathering evidence for a criminal prosecution, and there are circumstances when the technician does not have any reason to believe that the results will be used in a prosecution. The results of laboratory tests performed with respect to a person not suspected of illegal activity, for example, would not be testimonial because the technician performing the test would not have reason to believe that the results would be used at trial. *See Magyari*, 63 M.J. at 127 ("Because the lab technicians were merely cataloging the results of routine tests, the technicians could not reasonably expect their data entries would 'bear testimony' against the [defendant]."). Similarly, tests performed in the course of medical treatment would not be testimonial so long as the primary purpose of the tests was to assist in the treatment of the patient.

USCA4 Appeal: 05-4883 Doc: 56 Filed: 08/22/2007 Pg: 19 of 19



whether to cross-examine a laboratory technician is one for the defendant to make. Although in many cases a defendant may choose not to exercise this right, cross-examination of laboratory technicians may be useful in some instances. Forensic test reports are not always accurate. Testing errors are sometimes caused by technician inexperience, sample contamination, failure to follow laboratory protocols, or breaks in the chain of custody. Furthermore, on rare occasions laboratory technicians have "engage[d] in long-term systematic, and deliberate falsification of evidence in criminal cases." Pamela R. Metzger, *Cheating the Constitution*, 59 Vand. L. Rev. 475, 499 (2006). In one notorious case, a forensic serologist at the West Virginia Department of Public Safety falsified hundreds of forensic tests between 1979 and 1989. *Id.* The best way to expose errors or falsification in testing is through cross-examination of the laboratory technician. *See Crawford*, 541 U.S. at 61 (stating that the reliability of testimony is best determined "in the crucible of cross-examination").

In sum, the laboratory test results admitted against Washington were testimonial statements. Washington therefore had the right to confront and cross-examine the technicians who conducted the tests on his blood. Because Washington was not provided this opportunity, and the government does not contend that the witnesses were unavailable, his Confrontation Clause right was violated.